**UNITED STATES, Appellee,**

v.

**Patrick J. MEADE, Defendant, Appellant.**

No. 96–1360.

United States Court of Appeals,
First Circuit.

Heard Feb. 4, 1997.

Decided April 8, 1997.

Paul F. Markham by Appointment of the Court, Melrose, MA, for appellant.

Kimberly S. Budd, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney, was on brief for appellee.

Before SELYA, Circuit Judge, CYR, Senior Circuit Judge, and STAHL, Circuit Judge.

STAHL, Circuit Judge.

In December 1993, federal agents arrested defendant-appellant Patrick J. Meade in Massachusetts for his suspected involvement in the attempted robbery of an armored vehicle. A federal grand jury in Rhode Island returned an indictment charging him with various offenses related to the attempted robbery. Before trial, the federal district court in Rhode Island dismissed the count that charged Meade with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). After a jury trial, Meade was acquitted of all remaining counts. Subsequently, the government prosecuted the felon-in-possession count in Massachusetts federal district court, and in December 1995, a federal jury in that state found Meade guilty of that offense. The court then imposed a seventy-month imprisonment term, taking into account Meade's conduct in the attempted robbery.

On appeal, Meade raises four distinct claims: (1) federal agents lacked probable cause to arrest him; (2) the instant prosecution violated the Speedy Trial Act because of his earlier arrest, indictment on the same charge, and subsequent dismissal of the charge; (3) the district court erred in failing to instruct the jury on his theory of the case; and (4) the district court erred when it enhanced his sentence based on conduct underlying charges of which he had been acquitted. Finding none of these arguments persuasive, we affirm. We provide the pertinent background facts as necessary to the discussion of each contention.

# I.

### Probable Cause

After a three-day evidentiary hearing, the district court found that, at the time of Meade's arrest, agents of the Federal Bureau of Investigation ("FBI") had information from which they could reasonably believe that he and two others were about to rob an armored courier van. Based on this finding, the court determined that Meade's warrantless arrest did not violate his Fourth Amendment rights and denied his pre-trial motion to suppress a firearm seized during a search incident to his arrest. On appeal, Meade renews his contention that agents lacked probable cause to arrest him.

## A. Standard of Review

■ We review the district court's legal conclusions on a motion to suppress *de novo* and examine its factual findings for clear error. *United States v. Young*, 105 F.3d 1, 5 (1st Cir.1997). "[T]he decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause" presents a mixed question of law and fact which is subject to plenary review. *Ornelas v. United States*, —— U.S. ——, —— – ——, 116 S.Ct. 1657, 1661–62, 134 L.Ed.2d 911 (1996).

## B. Probable Cause

■ A warrantless arrest requires probable cause, the existence of which must be determined in light of the information that law enforcement officials possessed at the time of the arrest. *See United States v. Diallo*, 29 F.3d 23, 25 (1st Cir.1994). "Probable cause exists when police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person would believe the suspect had committed or was committing a crime." *Young*, 105 F.3d at 6. To establish probable cause, the government "need not present the quantum of proof necessary to

convict." *United States v. Uricoechea–Casallas*, 946 F.2d 162, 165 (1st Cir.1991).

## C. Discussion

The operation culminating in Meade's arrest involved numerous FBI agents. Several of these agents testified to their own observations of the events leading up to the arrest as well as to other agents' observations communicated to them via FBI radio. Based on the testimony and evidence presented, Meade contends that the FBI agent who ordered his arrest, Agent John Newton, lacked information sufficient to believe that Meade was committing a crime. The government disputes this claim and, invoking the proposition that "probable cause is determined in light of the collective knowledge of the law enforcement officers involved in an investigation," further relies upon certain facts known to other agents, but not to Agent Newton. Because of the relative complexity of the law-enforcement operation preceding Meade's arrest, we begin with a brief discussion of principles that pertain when the government seeks to establish probable cause on the basis of knowledge possessed by more than one participant.

### 1. Fellow–Officer/Collective–Knowledge Rule

■ Under the "fellow-officer" rule, law enforcement officials cooperating in an investigation are entitled to rely upon each other's knowledge of facts when forming the conclusion that a suspect has committed or is committing a crime. *See United States v. Ventresca*, 380 U.S. 102, 111, 85 S.Ct. 741, 747, 13 L.Ed.2d 684 (1965) ("Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number."); *see generally* 2 Wayne R. LaFave, *Search and Seizure* § 3.5(a), at 250–52 (1996).[1] Thus, when a law enforcement officer with information amounting to probable cause directs an officer who lacks the knowledge to make the arrest, we "impute" to the arresting officer the directing officer's knowl-

---

1. *See also United States v. Asselin*, 775 F.2d 445, 446 (1st Cir.1985) (rejecting "totem pole hearsay" contention where special agent relied upon say" contention where special agent relied upon

local police officer's communication of information obtained from reliable informant).

edge. *See Burns v. Loranger,* 907 F.2d 233, 236 n. 7 (1st Cir.1990); *Karr v. Smith,* 774 F.2d 1029, 1032 (10th Cir.1985); *Mendoza v. City of Rome,* 872 F.Supp. 1110, 1116 (N.D.N.Y.1994); LaFave, *supra* § 3.5(b), at 255–58; *e.g., United States v. Paradis,* 802 F.2d 553, 556–57 (1st Cir.1986) (upholding arrest ordered by superior although the arresting officer may have lacked probable cause).[2]

The fellow officer rule underlies the well-worn maxim that "the collective knowledge and information of all the officers involved establishes probable cause for the arrest." *United States v. Paradis,* 802 F.2d 553, 557 (1st Cir.1986); *see United States v. Hinojos,* 107 F.3d 765, 767–69 (10th Cir.1997); *Karr,* 774 F.2d at 1031; *United States v. One 1975 Pontiac Lemans,* 621 F.2d 444, 449 (1st Cir. 1980). The "collective knowledge" or "pooled knowledge" principle has been used to validate arrests in two ways: (1) by tracing the arresting officer's action back to an *individual* in a law enforcement agency who possessed information sufficient to establish probable cause, and (2) by finding that the directing *agency* as a whole possessed the necessary facts. *See* LaFave, *supra,* § 3.5(b), at 259–60 (noting cases).

A sensible argument has been made that looking to the agency's knowledge as a whole is unwise because it may "encourage the dissemination of arrest orders based upon nothing more than the hope that the unevaluated bits and pieces in the hands of several different officers may turn out to add up to probable cause." LaFave, *supra* § 3.5(b), at 260. In the same vein, the collective-knowledge corollary of the fellow officer rule would seem to require, or at least presuppose, the flow of information from the officers with knowledge of facts tending to establish probable cause to those lacking that knowledge (or, at least, to the directing or arresting officer). *See* LaFave, *supra* § 3.5(b), at 260–61 n.53, § 3.5(c), at 266 n.72 (citing cases).[3]

We have not directly addressed the question whether the collective-knowledge rule is limited to situations in which the knowledge vests in a pertinent individual—such as the directing or arresting officer—or whether the rule broadly encompasses situations in which the officers or agency as a whole possess the requisite information. In this case, the government attempts to invoke the broader application. Here, however, we need consider neither the possible permutations of these principles nor choose between them[4] because we find that both the directing officer and the arresting officer individually possessed the requisite knowledge, albeit from different facts, to establish probable cause.

## 2. Suppression Hearing Evidence

In light of this discussion, we review in some detail the suppression hearing evidence and the court's factual findings regarding the various FBI agents' observations and communications throughout the operation that

---

**2.** If it turns out, however, that the directing officer lacked probable cause to order the arrest, then the arrest itself is unlawful regardless of the arresting officer's otherwise proper reliance. *See Whiteley v. Warden,* 401 U.S. 560, 568, 91 S.Ct. 1031, 1037, 28 L.Ed.2d 306 (1971) (explaining that although arresting officers are "entitled to assume" that fellow officers seeking help to execute arrest warrant had probable cause, arrest is unlawful where warrant did not issue upon probable cause); *Mendoza,* 872 F.Supp. at 1116.

**3.** *See e.g., State v. Cooley,* 457 A.2d 352, 355 (Del.1983) ("To say in the abstract that probable cause is to be evaluated on the basis of the collective information of the police ignores the underlying assumption—and factual reality—that there is some communication between those officers, who do know facts amounting to probable cause, and those who do not.").

**4.** One approach is to presume communication, absent the defendant's rebuttal. *See generally United States v. Shareef,* 100 F.3d 1491, 1503–05 (10th Cir.1996) (discussing presumption of communication underlying imputation of knowledge among officers working together, but declining to impute to one officer another's knowledge of defendant's physical characteristics in light of trial judge's specific finding that such information had not been shared) (also opining that even absent evidence of communication, it may be appropriate to consider, under "single organism" theory, "collective knowledge" of officers acting collectively to determine reasonableness of their behavior); *see also Illinois v. Andreas,* 463 U.S. 765, 771–72 n. 5, 103 S.Ct. 3319, 3324–25 n. 5, 77 L.Ed.2d 1003 (1983) (explaining that the knowledge of one official is "presumed shared" by others cooperating in an investigation).

resulted in Meade's arrest. We pay particular attention to the observations and knowledge of Agent Newton, the directing officer, and Agent Jay Fallon, the arresting officer, and, in doing so, we view the evidence in the light most favorable to the court's ruling. *See United States v. Maguire,* 918 F.2d 254, 257 (1st Cir.1990).

Several days before December 23, 1993, an informant advised FBI special agent Frank Brosnan, the case agent in charge of this matter, that two men, Lawrence "Mitch" Lanoue and Albert Cole, assisted by at least one additional unidentified person, would attempt to rob an armored courier vehicle. The informant reported that the robbery would occur in a mall or congested area and that the suspects would use a particular vehicle in the operation: namely, a stolen gray 1985 Oldsmobile (the "gray Olds" or "Olds"). In fact, the gray Olds had already been located and law enforcement personnel had surreptitiously planted an electronic tracking device in it.

In the early morning hours of December 23, 1993, at the state police barracks in Rhode Island, case agent Brosnan briefed a twenty-member Special Weapons and Tactics ("SWAT") team and its commander, Agent Newton, regarding what was known about the purported heist. FBI surveillance teams were deployed in the air and on the ground to monitor the movements of the gray Olds, which was located on a farm in Pascoag, Rhode Island at that time. The surveillance team also kept watch over a house in nearby Harrisville, Rhode Island, where they suspected Lanoue to be staying. The FBI SWAT team stood by, ready to respond if the surveillance team reported suspicious movements connected to the Olds.

At about 9:50 a.m., a surveillance pilot noticed a pickup truck pull out of the Harrisville driveway, drive to the nearby Pascoag farm, and park near the gray Olds. The pilot communicated his observations over FBI radio. He advised that he observed the truck's driver and several other people move between the two vehicles, apparently placing items into the Olds' trunk. Around 10:00

a.m., the pickup truck and the gray Olds exited the farm and drove through Woonsocket to a shopping mall in Cumberland, Rhode Island. Ground surveillance units, followed by Agent Newton and other SWAT team members, began to trail the vehicles with assistance from the air surveillance unit. During the operation, Agent Newton monitored two FBI radio frequencies, one dedicated to the surveillance units, which transmitted both air and ground communications, and the other to the SWAT units.

The pickup truck's driver left the truck in the Cumberland mall parking lot and entered the gray Olds, which then proceeded over the Rhode Island state line toward a shopping mall (the "Ames mall") in Bellingham, Massachusetts.[5] At approximately 10:40 a.m., after stopping briefly outside the entrance of the Ames mall, the gray Olds travelled down a street leading to the back of the Ames department store. The surveillance pilot warned the ground teams not to enter the street, which was a dead-end. At the rear of the Ames store, the Olds' occupants rendezvoused with a person (or persons) in a parked brown automobile. Over the next ten minutes, several individuals moved between the two vehicles.

Around that time, approximately 10:50 a.m., Agent Newton and his SWAT team arrived at the Ames mall. At Agent Newton's direction, the SWAT team members placed their vehicles in various locations in the parking lot. Agent Newton had just heard over the radio about the gray Olds and brown vehicle parked together behind the Ames store. He also heard the surveillance pilot state that an individual who exited the brown vehicle had entered the gray Olds, though the pilot did not provide a description of this individual. Shortly thereafter, the surveillance pilot radioed to the ground crew that the brown vehicle was leaving the area behind the Ames store, and asked if he should follow it. The pilot was directed to stay with the gray Olds. Although Agent Newton had been monitoring the surveillance frequency along with the SWAT frequency,

---

5. The surveillance pilots were able to observe the pickup truck throughout the morning and noted

that it did not move from its spot in the Cumberland mall.

he was unaware of the communication that the brown car had departed.

Shortly thereafter, the gray Olds left the mall area, made several turns through a residential area, returned, and stopped near the entrance to the Ames department store. The surveillance pilot observed a heavyset man wearing dark clothing exit the Olds and walk toward the store. The pilot noticed what appeared to be a red bag over the man's shoulder. Agent Newton heard the pilot's description of the man over the radio and also received information that the heavyset individual was lingering in the area in front of the Ames store. At approximately 11:00 a.m., Agent Newton directed another agent to look for the heavyset man. The agent entered and searched the Ames store, but could not find him. A short time later, a different man, wearing a dark knit cap, entered the Olds and remained in it for approximately fifteen minutes. That individual then left the vehicle, entered the Ames store, and returned minutes later.

Agent Newton subsequently received a communication that around 11:25 a.m., the heavyset man returned to the gray Olds and joined the other occupants.[6] The car then drove around the Ames mall parking lot. At one point, it passed special agent Jay Fallon, a SWAT team member, who was seated in a vehicle located just inside the entrance to the Ames mall. Agent Fallon, who would ultimately assist in the actual arrest of Meade, had a direct view of the three passengers in the vehicle, and he recognized two of them, Lanoue and Cole, from previously furnished photographs. The gray Olds then left the parking area.

Around 11:35 a.m. or 11:40 a.m., Agent Newton observed an unmarked armored van approach and park directly in front of the Ames store. A uniformed courier immediately exited the van, entered the store and walked toward the store's main business office. Shortly thereafter, Agent Newton received a communication that the gray Olds

had reentered the Ames mall parking area and was heading toward the Ames store. About that time, Agent Fallon heard the same or a similar transmission, and that an individual who had been seen in the gray Olds was now in a brown Pontiac that had entered the parking area.[7] Agent Fallon then personally observed the gray Olds and recognized its two passengers, Lanoue and Cole. Agent Newton observed the gray Olds pull into a parking space, and noticed only two people inside.

At approximately 11:45 a.m., Agent Newton observed a passenger exit the gray Olds, and recognized him from previously reviewed photographs as Lanoue. Lanoue walked toward the armored van, looking over his shoulder toward the area of the Ames store in which the courier had entered. At that point, Agent Newton, via radio, advised that he along with other agents would arrest Lanoue, directed other agents in his vehicle to arrest the remaining person in the gray Olds, and ordered the other SWAT units to locate the brown car and arrest the third man.

Upon hearing the arrest order, Agent Fallon drove his vehicle a short distance through the parking area and came upon the third individual, who was exiting a brown Pontiac. With other agents already on the scene, Agent Fallon ordered the man to the ground, advised him he was being arrested by the FBI, handcuffed him and searched him. During the search, Agent Fallon found a fully loaded five-shot .38 caliber pistol in the suspect's coat pocket. The person subsequently was identified as Patrick Meade.

### 3. Analysis

Meade argues that Agent Newton did not have sufficient information to order the agents to locate and arrest the occupant of the brown vehicle. He contends that, even assuming the existence of probable cause to arrest Lanoue and Cole, the agents lacked

6. At this point, another SWAT team member saw the heavyset man enter the gray Olds. This agent identified what previously had been described as a "red bag" over the man's shoulder as a red-checked hood attached to his coat.

7. Agent Fallon had not heard the transmission concerning the earlier observation of the brown car behind the Ames store.

probable cause to arrest him simply because he happened to be sitting in a brown vehicle. We disagree.

Preliminarily, we leave undisturbed the district court's conclusion that the agents, through their observations, confirmed the informant's tip regarding specific facts surrounding the suspected attempted robbery, and that this confirmation legitimately supported a finding of probable cause.[8] The tip specifically identified two of the attempted-robbery participants, indicated the existence of at least one additional unidentified participant, and specified one of the vehicles to be used. Many of the activities that occurred throughout the morning corroborated the informant's story: the use of several vehicles, including the nearby positioning of the pickup truck and the meeting with the brown vehicle; the suspects' apparent casing of and waiting at the Ames mall; the suspects' return to the mall after the armored van's arrival; and Lanoue's approach toward the van.

█ With regard to Meade's specific appellate challenges, we find that Agent Newton had information sufficient to order the agents to locate the brown car and arrest the third man (Meade). We acknowledge that Agent Newton admitted that he did not recall any communication about the brown vehicle entering the parking lot at that time, and that he essentially guessed that the third individual would be found in it. Nevertheless, we find that Agent Newton formulated a reasonable arrest order that took into account both his own personal observations and the facts communicated to him by other agents. He knew the following information: at least one additional individual was involved in the scheme, a brown vehicle connected with the operation had been seen behind the Ames store less than one hour before the arrest,[9] an individual who had exited the brown car had entered the gray Olds, and the gray Olds had left the Ames mall parking area with three passengers (all identified by name or description), but following the entrance of the armored van, reentered with only two passengers. As Agent Newton testified, "I knew there was a third individual that we didn't have a location for so I gave the directions to locate the brown vehicle and arrest the individual in the brown vehicle."

In the context of the arrest order, Agent Newton's arrest signal was not, as Meade would have us believe, some vague directive to locate any brown car and arrest whoever might be in it. Rather, the arrest order focused on the participants in the robbery conspiracy, directing the agents to locate *the* brown car and arrest "*the* third man" about whom descriptive communications had been exchanged that morning.[10] Under the applicable totality-of-the circumstances approach, *see United States v. Uricoechea–Casallas,* 946 F.2d 162, 165 (1st Cir.1991), we conclude that Agent Newton gave the arrest order upon probable cause, which the Supreme Court has characterized as "a fluid concept— turning on the assessment of probabilities in particular factual contexts," *Illinois v. Gates,*

---

**8.** *See Draper v. United States,* 358 U.S. 307, 312–14, 79 S.Ct. 329, 332–33, 3 L.Ed.2d 327 (1959) (finding probable cause to arrest where informer's detailed tip was verified by police observations of corroborating but otherwise innocent conduct).

**9.** Although Meade argues that Agent Newton knew the brown car had left the area behind the Ames store, we will not charge Agent Newton with facts he specifically denied knowing. *See United States v. Zurosky,* 614 F.2d 779, 786 (1st Cir.1979) (declining to apply collective-knowledge principle to impute knowledge to one officer who specifically denied knowing exculpatory fact known by another officer).

**10.** We reject Meade's perfunctory contention that the apprehension of other persons in a brown car that morning near the site of his arrest belies the finding that Agent Newton had probable cause to give the arrest order. The district court did not address this issue, and our careful review of the record reveals that, although occupants of another brown vehicle were detained, none of the testifying agents knew any details regarding the circumstances of that detention. On appeal, the government claims that the other brown vehicle had driven over a curb and appeared to be attempting to flee the scene. In the absence of record evidence supporting either that claim or Meade's suggestion that the detention was a direct response to Agent Newton's faulty arrest

462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983).[11]

■ Under the fellow officer rule, we impute Agent Newton's knowledge of facts amounting to probable cause to Agent Fallon, the arresting officer. *See Burns*, 907 F.2d at 236 n. 7. The record also establishes, however, that Agent Fallon individually had sufficient information, independent of Agent Newton's knowledge, to arrest Meade. Agent Fallon had been briefed earlier that morning that, as a SWAT team member, he might be required to "interdict" an armed robbery of an armored courier vehicle. He had also been provided with photographs of Lanoue and Cole, and was in radio communication with the other SWAT members on the scene. That morning, Agent Fallon personally observed Lanoue, Cole, and the person later identified as Meade, in the previously identified gray Olds. Subsequently, he received a transmission that an individual who had been seen in the gray Olds had entered the parking area in a brown Pontiac, and he observed the gray Olds with only Lanoue and Cole inside.

■ Upon hearing the arrest order—to locate the brown car and arrest the third man—Agent Fallon possessed sufficiently particularized knowledge to effect the arrest order specifically as to Meade: he knew what the third man looked like and had information that the man was in a brown Pontiac in the parking area. In other words, at the time of the arrest, the facts and circumstances known to Agent Fallon (albeit somewhat different facts than those known to Agent Newton) were sufficient to warrant a reasonably prudent person to believe that Meade was committing an offense. Contrary to Meade's suggestion, Meade was not simply some unfortunate who happened to be sitting in a brown car in the parking lot that morning.[12]

■ Meade's final contention is that, even assuming he associated with Cole and Lanoue on the morning of his arrest, his "mere presence" in their company "a substantial period of time before his arrest" did not provide probable cause for his arrest. We disagree. On the morning of Meade's arrest, agents observed: a brown vehicle parked next to the gray Olds behind the Ames store; Meade exiting the gray Olds in front of the Ames store then returning to the vehicle some time later; Meade riding around with Lanoue and Cole in the gray Olds; and Meade sitting in a brown vehicle near the location and at the time of the suspected attempted robbery. While "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person," *Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238 (1979), these facts reveal "substantially more than a momentary, random, or appar-

11. *See also Ornelas v. United States*, —— U.S. ——, ——, 116 S.Ct. 1657, 1661, 134 L.Ed.2d 911 (1996) (explaining that probable cause is a "common sense, nontechnical conception[ ] that deal[s] with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act' " (quoting *Gates*, 462 U.S. at 231, 103 S.Ct. at 2328 (additional quotation marks and citation omitted))).

12. Our conclusion is unchanged by the indication in the record that other FBI agents may have begun the arrest process before Agent Fallon found Meade, even though Agent Fallon ordered Meade to the ground, told him he was under arrest, and handcuffed and searched him. Even viewing the evidence in the light most favorable to Meade, when Agent Fallon came upon Meade, Meade had just exited his vehicle and, at most, had begun to drop to his knees.

order, we, like the district court, assign no significance to this event.

On these facts, regardless of the presently unknown knowledge of the other agents (none testified at the suppression hearing), it is apparent that Agent Fallon would have imminently and lawfully discovered and arrested Meade. *Cf. United States v. Procopio*, 88 F.3d 21, 27 (1st Cir.) (explaining that otherwise unlawful search may be upheld where the government proves "by a preponderance of the evidence that the evidence would inevitably have been discovered by lawful means") (citing *Nix v. Williams*, 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984)), *cert. denied*, —— U.S. ——, 117 S.Ct. 620, 136 L.Ed.2d 543 (1996), *and cert. denied*, —— U.S. ——, 117 S.Ct. 1008, 117 S.Ct. 1008 (1997); *United States v. Ragsdale*, 470 F.2d 24, 30–31 (5th Cir.1972) (upholding vehicle search by officer lacking probable cause where partner officer on scene had probable cause and search "would have almost instantaneously gone forward" under that officer's direction).

ently innocent association between [Meade] and the known criminal activity." *United States v. Martinez–Molina,* 64 F.3d 719, 727 (1st Cir.1995).[13] We agree with the district court's conclusion that the agents' "observations gave them a sound basis for concluding that the large man in the red-hooded blue coat sitting in the brown car was a participant with Lanoue and Cole in the robbery."

 Thus, we conclude that the agents had probable cause to arrest Meade, and, therefore, that they lawfully seized the firearm found during the search incident to his arrest. *See Uricoechea–Casallas,* 946 F.2d at 165 ("If an arrest is lawful, the arresting officers are entitled to search the individual apprehended pursuant to that arrest.").

## II.

### Speedy Trial Act

Meade contends that by virtue of his initial arrest and federal indictment in Rhode Island on the same charge underlying this conviction, the instant proceedings violated the Speedy Trial Act. By way of context, we describe the procedural background underlying his argument. As we have said, federal agents first arrested Meade in Bellingham, Massachusetts on December 23, 1993. On that day, the government issued out of the District of Rhode Island a complaint that, *inter alia,* charged Meade with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). On January 5, 1994, a federal grand jury in Rhode Island returned an indictment charging Meade in five of seven counts, including the felon-in-possession count, conspiracy, attempted robbery, and using and carrying firearms during and in relation to a crime of violence.

In July 1994, Meade moved to dismiss the felon-in-possession count on the grounds of improper venue, arguing that the govern-ment had no evidence that he had possessed the firearm in Rhode Island.[14] In August 1994, the government also moved to dismiss the felon-in-possession count "in order that charges in that count may be prosecuted in the District of Massachusetts." On August 16, 1994, the federal district court in Rhode Island dismissed the count without prejudice.[15] On November 4, 1994, a Rhode Island federal jury acquitted Meade of the remaining counts.

More than nine months later, on August 16, 1995, a federal grand jury in Massachusetts indicted Meade on one felon-in-possession count based upon the December 23, 1993 events. His arrest on this indictment occurred on August 23, 1995. The district court denied Meade's subsequent motion to dismiss the indictment on his claim of a Speedy Trial Act violation.

Meade now argues that his December 1993 arrest in Bellingham, Massachusetts was "within the sole geographical jurisdiction of the District of Massachusetts" and that, in the absence of evidence that he possessed a firearm elsewhere, the federal district court in Massachusetts had exclusive "jurisdiction" over the prosecution of the felon-in-possession charge. Thus, Meade reasons, the Rhode Island proceedings on that count "were a nullity" and the failure to indict him in Massachusetts within thirty days of his initial December 23, 1993 arrest violated the express provisions of, and purposes behind, the Speedy Trial Act, 18 U.S.C. §§ 3161–3167. Meade's argument is somewhat novel and it presents questions of law which we review *de novo. See United States v. Rodriguez,* 63 F.3d 1159, 1162 (1st Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 681, 133 L.Ed.2d 529 (1995).

 The Speedy Trial Act, which "insures speedy indictments as well as speedy

---

13. *See also Martinez–Molina,* 64 F.3d at 729 (noting that "officers in the field" are not required to "ignore the fact that 'criminals rarely welcome innocent persons as witnesses to serious crimes and rarely seek to perpetrate felonies before larger-than-necessary audiences' ") (quotation marks and citation omitted).

14. Although Meade, Lanoue and Cole were arrested at the site of the attempted robbery in Massachusetts, it appears that the government prosecuted the case in Rhode Island because many of the preparatory activities in the robbery plan occurred there.

15. The record does not clearly reveal whether the court dismissed the count in response to Meade's or the government's motion, or perhaps, on its own motion.

trials," *United States v. Samples,* 713 F.2d 298, 301 (7th Cir.1983), provides, in pertinent part: "Any information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested . . . in connection with such charges," 18 U.S.C. § 3161(b). The apparent purpose of the thirty-day arrest-to-indictment rule "is to ensure that the defendant is not held under an arrest warrant for an excessive period without receiving formal notice of the charge against which he must prepare to defend himself." *United States v. Berry,* 90 F.3d 148, 151 (6th Cir.) (citing *United States v. McCown,* 711 F.2d 1441, 1447 (9th Cir.1983)), *cert. denied,* —— U.S. ——, 117 S.Ct. 497, 136 L.Ed.2d 389 (1996).

■ Meade first argues that Article III, Section 2, clause 3 of the United States Constitution [16] and Federal Rule of Criminal Procedure 18 [17] precluded the Rhode Island district court's exercise of jurisdiction over the felon-in-possession charge against him. We disagree. The Constitution and Rule 18 protect a criminal defendant's venue—not jurisdictional—rights. *See United States v. Josleyn,* 99 F.3d 1182, 1189 n. 7 (1st Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 959, 136 L.Ed.2d 845 (1997); *see also id.* ("Venue 'concerns only the place where the case may be tried[,]' whereas jurisdiction 'has to do with the authority or power of a court to try a case.' ") (quoting Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 16.1, at 334 (1984 & Supp.1991) (alteration in original)). We have further recognized that venue is a waivable personal privilege designed for the benefit of the defendant. *See United States v. Santiago,* 83 F.3d 20, 24 (1st Cir. 1996). As such, the constitutional and statutory venue provisions are not restrictions on the court's jurisdiction. [18]

■ Thus, at most, venue, but not jurisdiction, was questionable in Rhode Island. Given that criminal venue rights are waivable, had Meade consented to proceedings in Rhode Island on the felon-in-possession count in the first indictment, the disposition of those proceedings would have been "valid" as a matter of venue as well as jurisdiction. It follows that although the first indictment arguably was returned in an improper venue for prosecution, for the purposes of the Speedy Trial Act, it was not "a nullity" for lack of jurisdiction. [19]

Having established that Meade's "jurisdictional" challenge to the Rhode Island proceedings on the felon-in-possession count is unavailing and that the Rhode Island indictment was filed within the Speedy Trial Act's thirty-day rule, we turn to the effect of the Massachusetts indictment, returned approximately one-and-a-half years after his original arrest. Meade suggests that the Speedy Trial Act required his subsequent indictment also to have been filed within thirty days from the December 23, 1993 arrest. We disagree.

■ The first indictment, returned January 5, 1994, was filed well within thirty days from Meade's December 23, 1993 arrest. Manifestly, the return of that indictment stopped the thirty-day arrest-to-indictment time limitation. Based on our previous holding that the thirty-day limit "applies only

---

16. "The trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed." U.S. Const. art. III, § 2, cl. 3.

17. "Except as otherwise permitted by statute or by these rules, the prosecution shall be had in a district in which the offense was committed." Fed.R.Crim.P. 18.

18. *See* 2 Charles A. Wright, *Federal Practice and Procedure,* § 306, at 219–20 (1982) (citing cases); *see also* 18 U.S.C. § 3231 (providing, without geographical limitation, that federal district courts have original jurisdiction "of all offenses against the laws of the United States").

19. Meade does not argue that improper *venue* bears upon the validity of the indictment for Speedy Trial Act purposes. Because venue objections may be waived, we doubt that improper venue would invalidate an indictment for these purposes. Moreover, even assuming the "nullity" of the first indictment, there exists support for the proposition that its timely return would satisfy the thirty-day limit of § 3161(b). *See United States v. Perez,* 845 F.2d 100, 102 (5th Cir.1988) (stating that "[s]ection 3161(b) applies to 'any' indictment, including one that subsequently is found to be defective or invalid").

where, at the time of indictment, the charge upon which a defendant was arrested and upon which a complaint was issued is still pending," *United States v. Krynicki*, 689 F.2d 289, 293–94 (1st Cir.1982), we disregard the period from the dismissal of the charge on August 16, 1994, to the initiation of the Massachusetts proceedings. Because the second prosecution commenced with an indictment, not an arrest, it simply did not trigger § 3161(b)'s arrest-to-indictment limitation. *See United States v. Gurary*, 860 F.2d 521, 528 (2d Cir.1988); *Samples*, 713 F.2d at 303. We conclude that the return of the indictment in Massachusetts more than a year-and-a-half after the original arrest did not violate § 3161(b).

■■■■ This result does not frustrate the purposes animating the Speedy Trial Act. In enacting the Speedy Trial Act, Congress acknowledged that a person subject to prolonged pretrial delays faces a number of debilitating factors, including "the disruption of family life, loss of employment, anxiety, suspicion, and public obloquy." *Krynicki*, 689 F.2d at 294. After dismissal of formal charges, however, any such strain "is no greater than it is upon anyone openly subject to a criminal investigation." *United States v. MacDonald*, 456 U.S. 1, 9, 102 S.Ct. 1497, 1502, 71 L.Ed.2d 696 (1982) (involving Sixth Amendment speedy trial guarantee), *quoted in Krynicki*, 689 F.2d at 294. While Meade may be disappointed that the government successfully brought these proceedings after his acquittal in Rhode Island on related charges, he cannot complain that the pro-

ceedings thwarted the policies of the Speedy Trial Act.[20]

### III.

### *Defense Theory Instruction*

■■■■ Meade argues that the district court erroneously failed to instruct the jury on his theory of the case. Specifically, he challenges the court's refusal to give a requested instruction touching upon his "intent" in possessing the firearm for the purposes of 18 U.S.C. § 922(g)(1).[21] "Ordinarily, a defendant is entitled to an instruction on his theory of the case as long as it is legally valid and there is sufficient evidence, viewed in the light most favorable to the defendant, to permit a reasonable juror to credit the defendant's theory." *Josleyn*, 99 F.3d at 1194. Nevertheless, the court need not adopt the requested instruction verbatim if the charge as a whole adequately covers the defense theory. *See id.; United States v. Montanez*, 105 F.3d 36, 39 (1st Cir.1997).

At trial, Meade testified to the following events, which we take as true for the purposes of this appeal. In early December 1993, he went to the home of a friend, Paul Bartel, who had just threatened to commit suicide. When Meade arrived at Bartel's residence, Bartel was playing with a gun. Meade took the gun from Bartel in order to prevent Bartel from harming himself, and placed the gun in the back seat of his (Meade's) car. He forgot about the gun and did not touch it again until shortly before his arrest on December 23, when he spotted it in his car and placed it in his pocket.

20. Meade further asserts that the "piecemeal prosecution" of this case violates the United States Department of Justice's policy "that several offenses arising out of a single transaction should be alleged and tried together and should not be made the basis of multiple prosecutions, a policy dictated by considerations both of fairness to defendants and of efficient and orderly law enforcement." *Petite v. United States*, 361 U.S. 529, 530, 80 S.Ct. 450, 451, 4 L.Ed.2d 490 (1960). The Justice Department's so-called *"Petite policy,"* which guards against various dual or subsequent prosecutions, does not help Meade given our repeated holding that the policy "does not confer substantive rights on criminal defendants." *United States v. Gary*, 74 F.3d 304, 313 (1st Cir.) (citing cases), *cert. denied*, ─ U.S. ─, 116 S.Ct. 2567, 135 L.Ed.2d 1084 (1996).

Finally, Meade perfunctorily complains that the "government should not [have been] permitted to hedge against an adverse verdict" by seeking this conviction after the acquittal in Rhode Island. To the extent Meade suggests an unconstitutional pre-indictment delay, his conclusory plaint falls well short of the requisite showing of significant prejudice to him and intentional bad-faith delay on the part of the government. *See United States v. Crooks*, 766 F.2d 7, 11 (1st Cir. 1985). As such, we deem this contention waived. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.1990).

21. 18 U.S.C. § 922(g)(1) makes it unlawful for a convicted felon to "possess in or affecting commerce, any firearm or ammunition."

At the close of the evidence, the district court instructed the jury on the concept of actual possession, as well as constructive possession substantially in accord with our discussion in *United States v. Rogers*, 41 F.3d 25, 29–30 (1st Cir.1994) (explaining the meaning of "constructive possession" for purposes of § 922(g)). The court further distinguished "ownership" from possession, instructing that the government need not prove Meade's ownership of the firearm. With respect to the requisite *mens rea*, the court explained that the government must have proven that Meade "knowingly" possessed the firearm; that is, "he possessed it voluntarily and purposefully and not by accident or mistake." Finally, the court told the jury that the purpose for which Meade possessed the firearm was irrelevant to the question whether he committed the offense.[22]

Meade requested the court to instruct the jury that, in order to prove the "knowing possession" of the firearm, the government must establish that he "possessed the firearm with the intent to exercise dominion and control over it," and that "not every incidental contact with the firearm would automatically compel [the jury] to find that ... he possessed ... it as alleged in the indictment." For support, Meade cites the unpublished case [23] of *United States v. DiNovo*, 57 F.3d 1061 (1st Cir.) (TABLE), 1995 LEXIS 14622, 1995 WL 354829, *cert. denied*, —— U.S. ——, 116 S.Ct. 404, 133 L.Ed.2d 323 (1995). Meade further asked the court to instruct the jury that "dominion" and "con-

trol" are "overlapping concepts" and that "[d]ominion ... is generally defined as 'perfect control in right of ownership.' " *Rogers*, 41 F.3d at 29, 30 (quoting Black's Law Dictionary 436 (5th ed.1979)).

Meade informs us that his "defense theory" was that, because he did not have the intent to exercise dominion and control over the firearm, he did not possess it for "criminal purposes" and thus, he lacked the "requisite intent" to possess. He complains that the court's failure to charge the jury as requested deprived the jury of the opportunity to consider the circumstances under which the firearm was found on his person. He contends that the jury should have been able to give due weight to his "prudent" decision first to take the firearm from Bartel and then to remove it from his car ("rather than leave it there") upon rediscovering it.

■■■ We are unpersuaded by Meade's highlighting of choice phrases from the unpublished *DiNovo* case and from *Rogers*'s discussion of constructive possession [24] to fashion a novel and somewhat heightened definition of possession that approximates ownership.[25] His attempt to mold his novel definition to suit his "absence of criminal purpose" defense theory is a further stretch. Viewing the evidence in the light most favorable to Meade, we conclude that his "good purpose" in taking and retaining possession of the gun would not have constituted a valid defense as a matter of law.[26] Therefore, we

---

**22.** Because we ultimately find that Meade's requested instruction is incorrect as a matter of law, and because he does not otherwise appeal the court's charge, we need not pass on the accuracy of the charge as given.

**23.** Our Local Rules prohibit the citation of unpublished opinions, which are bereft of any precedential force, except in related cases. *See* 1st Cir. R. 36.2(b)6.

**24.** *See Rogers*, 41 F.3d at 30 (explaining that, under trial court's instructions, "dominion" encompassed the concept of control).

**25.** That Meade assertedly did not own the gun in his pocket does not vitiate his possession of it for § 922(g) purposes. *See United States v. Hubbard*, 61 F.3d 1261, 1272 (7th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1268, 134 L.Ed.2d 216 (1996). Ownership, for purposes of *constructive possession* analysis, "may be highly rele-

vant where the authority to exercise *control* is disputed." *Rogers*, 41 F.3d at 30 (emphasis added). The presence of the gun in Meade's coat pocket, however, more accurately triggers the concept of actual, rather than constructive, possession. *See United States v. Zavala Maldonado*, 23 F.3d 4, 7 (1st Cir.1994) (describing actual possession as "immediate, hands-on physical possession"). In any event, under either an actual or constructive possession rubric, Meade's own testimony dispensed with any dispute regarding his control of the gun; he admitted that he saw the gun in his car, and, unencumbered, picked it up and placed it in his pocket.

**26.** We note that Meade did not (and does not) claim that he was entitled to an instruction in the nature of a necessity or justification defense. *See United States v. Gomez*, 92 F.3d 770, 774 (9th Cir.1996) (explaining application of justification defense in felon-in-possession case) (citing

find no error in the court's refusal to give Meade's requested instruction on his theory of the case. *See United States v. Rose,* 104 F.3d 1408, 1416 (1st Cir.1997) (explaining that such refusal warrants reversal only if, *inter alia,* defendant's requested instruction was "substantively correct").

## IV.

### Sentence Enhancement Based On Acquitted Conduct

At sentencing, the district court found that Meade possessed the firearm in connection with criminal conduct, of which the jury in Rhode Island acquitted him, surrounding the attempted robbery of the armored courier car. The court, therefore, increased his base offense level by four levels pursuant to U.S.S.G. § 2K2.1(b)(5).[27] Citing dicta in *United States v. Lanoue,* 71 F.3d 966, 983–84 (1st Cir.1995), Meade argues (as he did below) that, as a matter of law, the court could not constitutionally increase his sentence based on acquitted conduct.[28]

Meade's claim has no force because the Supreme Court recently abrogated the dicta in *Lanoue* and held "that a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence." *United States v. Watts,* — U.S. —, —, 117 S.Ct. 633, 638, 136 L.Ed.2d 554 (1997); *see id.* at — n. 1, 117

S.Ct. at 634 n. 1. Thus, the sentencing court did not err in considering conduct underlying charges of which Meade had been acquitted.

Meade did not challenge either below or in his appellate brief the weight of the court's factual finding that he possessed the gun in connection with the attempted robbery. At oral argument, however, Meade's counsel raised a related claim: that *Watts* mandates an evidentiary hearing before a court may sentence for acquitted conduct. The assertion is wrong. Although *Watts* explains that the sentencing guidelines require facts pertinent to sentencing to be proven by a preponderance of the evidence, *see* — U.S. at —, 117 S.Ct. at 637, it does not set forth a requirement that a district court hold an evidentiary hearing to establish such facts, whether or not they encompass acquitted conduct. Moreover, we do not mandate such a hearing in this circuit. *See United States v. Tardiff,* 969 F.2d 1283, 1286 (1st Cir.1992) ("It is clear that a defendant is not automatically entitled to a full-blown evidentiary hearing at the time of sentencing."). Finally, because Meade did not request an evidentiary hearing to challenge the facts underlying the Presentence Report's recommendation to count the acquitted conduct,[29] he has relinquished this final claim, such as it is, on appeal. *See id.* (finding that defendant waived the right to complain of the absence of an evidentiary hearing by failing to request one).

cases); *United States v. Lomax,* 87 F.3d 959, 961–62 (8th Cir.1996) (same); *see also United States v. Perez,* 86 F.3d 735, 737 (7th Cir.1996) ("The defense of necessity will rarely lie in a felon-in-possession case unless the ex-felon, not being engaged in criminal activity, does nothing more than grab a gun with which he or another is being threatened (the other might be the possessor of the gun, threatening suicide)"); *United States v. Newcomb,* 6 F.3d 1129, 1137–38 (6th Cir.1993) (allowing justification defense instruction where defendant removed gun from person threatening to shoot another, and briefly handled it to remove ammunition).

**27.** Section 2K2.1(b)(5) provides, in pertinent part:

If the defendant used or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any

firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense, increase by 4 levels.
U.S. Sentencing Guidelines Manual § 2K2.1(b)(5) (Nov.1995).

**28.** In *Lanoue,* a panel of this circuit expressed in dicta its belief in the unconstitutionality of permitting imprisonment on the basis of acquitted conduct, and stated that the guidelines' apparent requirement that a court sentence for such conduct "utterly lacks the appearance of justice." 71 F.3d at 984.

**29.** The district court adopted the statement of relevant conduct contained in the Presentence Report which largely recounted the facts disclosed during the suppression hearing and additionally noted that a pair of handcuffs were found in Meade's vehicle.

### V.

### *Conclusion*

For the foregoing reasons, we *affirm* the district court's judgment in all respects.