**UNITED STATES of America**

v.

**Samuel GORDON, Defendant.**

**No. CRIM. 98–CR–5–B–C.**

United States District Court,
D. Maine.

Sept. 18, 1998.

Gail Malone, AUSA, Office of the U.S. Attorney, Bangor, ME, for U.S.

J. Hilary Billings, Billings & Silverstein, Bangor, ME, Kirk Y. Griffin, Boston, MA, for Defendant.

## MEMORANDUM OF DECISION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

CARTER, District Judge.

On March 11, 1998, a federal grand jury charged Defendant Samuel Gordon with being a felon in possession of a firearm (Counts I and II) in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). *See* Indictment (Docket No. 4). Now before the Court is Defendant's Motion to Suppress (Docket No. 9), in which Defendant seeks to suppress the following evidence:

(A) a door lock/ignition key to a 1989 Dodge Ram pickup truck, Maine registration 43535Q;

(B) a Smith & Wesson Model 66 .357 Magnum caliber revolver, bearing serial number 47K3232, seized in the course of a warrantless search of the defendant's motor vehicle;

(C) a Colt Model 1917 U.S. Army .45 caliber revolver, bearing serial number 245500, as well as any testimonial evidence tending to show that the defendant possessed said weapon, and;

(D) Any and all admissions made by or attributed to the defendant on January 30, 1998, that are alleged to have occurred incidental to his arrest on that date.

Defendant's Motion to Suppress at 1–2. Defendant argues that his warrantless arrest and the warrantless searches and seizures at issue violated his rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments of the Constitution of the United States. For the reasons set forth below, the Court will deny Defendant's Motion to Suppress.

## I. BACKGROUND

The Court finds the relevant facts as follows. On approximately January 22, 1998, Detective Richard Frazee of the Fairfield Police Department contacted Deputy Chief Ricky Bonneau of the Skowhegan Police Department and notified him that the Fairfield Police Department was investigating a case involving Defendant. Transcript of Hearing on Motion for Suppression ("Tr.") (Docket No. 17) at 24. Detective Frazee indicated that his department had gained authorization for a probable-cause arrest from the District Attorney's office in Skowhegan and requested assistance from the Skowhegan Police Department. According to Detective Frazee, the determination of probable cause was based upon the following information.

On January 21, 1998, Nicole Craig, a Fairfield resident who had stayed home from school due to illness, saw a light blue Dodge truck pull into her neighbor's driveway. According to the witness, the man knocked on both her neighbor's door and her own door. She stated that he tried to open her door by turning the knob. He then went back to her neighbor's door, and she heard him moving through the house upstairs. She stated that he was in her neighbor's bedroom between five and ten minutes. After he had come downstairs and went out to his truck, she looked out her front window and saw him sitting in his truck. Craig felt that the man might have seen her in her window. He then pulled into her driveway and attempted to enter her apartment. The telephone rang, and Craig answered it, and the man left at that point. While he had been in her neighbor's apartment, Craig had written down the license plate of the light blue Dodge truck. She described the man as "old", although she could not see his hair because he was wearing a hat. Def. Ex. 8.

The Fairfield Police Department ran a registration check on the license plate number provided by Craig and determined that the vehicle belonged to Defendant.[1] Tr. at 5. Detective Frazee told Deputy Chief Bonneau that the physical description and date of birth revealed by the Department of Motor Vehicle's registration check matched the description provided by Craig and a witness to an earlier robbery.[2] Tr. at 8. The registra-

---

1. The registration check also revealed that a second vehicle, a brown Cadillac, was registered to Defendant. Tr. at 8.

2. Officer Bonneau indicated that Officer Frazee had also informed him of another Fairfield break-in which had occurred in the fall of 1997. Tr. at 7. A large, brown Cadillac had been involved in the earlier incident. *Id.*

tion check also indicated that Defendant lived at 345 Water Street in Skowhegan, but the landlord reported that Defendant had not lived there for seven or eight years. Tr. at 8. Detective Frazee also informed Deputy Chief Bonneau that they had run a criminal history check on Defendant and reported that Defendant had a lengthy criminal history including numerous convictions for breaking and entering, burglary, theft, and robbery. Tr. at 8–9; Gov. Ex. 2. Further investigation indicated that Defendant was currently receiving assistance from the Town of Skowhegan and was expected to go to the welfare office; located in the Skowhegan Town Hall, to collect his public assistance check. Tr. at 8.

The Fairfield Police Department had notified Skowhegan's Welfare Director, Judy Bowzer, and had asked her to notify the Skowhegan Police Department when Defendant came into her office. Tr. at 9. Deputy Chief Bonneau spoke with Ms. Bowzer and established that she would inform the Skowhegan Police Department when Defendant arrived. Tr. at 9. The welfare office was located in the same building as the police department. Tr. at 30. At approximately 10:00 a.m. on January 30, 1998, Ms. Bowzer called the police dispatcher and advised that Defendant was upstairs. Tr. at 29. Deputy Chief Bonneau accompanied Chief Butch Asselin upstairs, where Defendant was standing in the hallway outside the welfare office speaking with Bowzer. Tr. at 10.

In the initial encounter, Chief Asselin asked Defendant to confirm his identity and requested that Defendant accompany Chief Asselin and Deputy Chief Bonneau downstairs to the police department. Tr. at 75–76. Chief Asselin explained to Defendant that officers from the Fairfield Police Department wished to speak with him regarding a matter that had happened in Fairfield and advised Defendant that the officers were en route to the Skowhegan Police Department. Tr. at 75. Defendant accompanied Chief Asselin and Deputy Chief Bonneau downstairs to the police department. Tr. at 77.

The record is conflicted on the question of whether Defendant asked, during the encounter outside the welfare office, if he was under arrest or free to leave. Chief Asselin testified that Defendant did not ask if he was under arrest or free to leave during the exchange outside of the welfare office. Tr. at 76. Deputy Chief Bonneau testified that, while Defendant did not ask if he was under arrest during this conversation, he did ask if he was free to go. Tr. at 31 ("It seems like I do recall him saying something in the line of: Do I have to go downstairs. And he was advised that in fact he did."). Defendant testified that he asked if he was under arrest or if he was free to go. Tr. at 96. In response to all of these questions, Defendant stated that he was told he was not under arrest, but that he was not free to go either. Id. In addition, he was told that the officers would stop him if he attempted to leave. Id. Chief Asselin agreed that the Defendant was not free to leave at the time of the encounter outside the welfare office.[3] Tr. at 77.

Chief Asselin and Deputy Chief Bonneau escorted Defendant downstairs to the police department, where they took him to Chief Asselin's office to await the arrival of the Fairfield police officers. Tr. at 77. Deputy Chief Bonneau left the room, and Chief Asselin waited with Defendant. During the approximately twenty to thirty minutes which passed before Detective Frazee arrived, Chief Asselin asked Defendant about his residence and vehicles. Defendant stated, in response to being asked where he lived, that he lived "here and there." Tr. at 59. When asked about his vehicles, Defendant told Chief Asselin that both his pickup truck and his other vehicle were having mechanical problems and that he was traveling on foot. Tr. at 59. While Defendant was in Chief Asselin's office, he asked if he was free to leave or under arrest, and Chief Asselin told him that he was not free to leave. Tr. at 60. During this period, Defendant requested permission to use the restroom and did so in private. Tr. at 60, 80.

---

3. During the hearing on this motion, the Government indicated that Defendant was not, in fact, free to leave at that time and conceded that Defendant was under constructive arrest in the welfare office. Tr. at 14.

When Officer Frazee arrived, Defendant was escorted to the patrol room. Tr. at 11. Thereafter, Chief Asselin entered the rest room to check the stall used by Defendant, and upon inspection, discovered a key in the toilet.[4] Tr. at 61. Chief Asselin notified Deputy Chief Bonneau of his discovery, and Deputy Chief Bonneau retrieved the key, which was a key to a Chrysler vehicle. Tr. at 15, 61. Meanwhile, in the patrol room, Detective Frazee attempted to interview Defendant. Tr. at 12. Defendant asked if he was under arrest, and when Detective Frazee stated that he was trying to avoid placing Defendant under arrest, Defendant asked if he was free to leave. *Id.* At that point, Detective Frazee placed Defendant under arrest, and Defendant requested an attorney. Tr. at 12.

Defendant was then taken to the booking room. Tr. at 15. Once the Fairfield police officers had completed the booking procedure with Defendant, they left the Skowhegan police station with Defendant. At this point, Chief Asselin and Deputy Chief Bonneau decided to canvass the area for Defendant's pickup truck.[5] Tr. at 17. They searched in opposite directions from the police station, and Chief Asselin radioed Deputy Chief Bonneau, within a minute of separating from each other, that he had located the truck. *Id.* Upon arriving at the truck, Deputy Chief Bonneau inserted the key into the passenger-side door and unlocked it. *Id.* He then immediately locked the door again, using the key and without ever actually opening the door. *Id.*

Chief Asselin and Deputy Chief Bonneau then made a decision to have Defendant's truck towed and to perform an inventory search. Tr. at 18, 87. The decision to tow the vehicle was based on several considerations. First, Defendant had been arrested and was no longer present at the Skowhegan

police station. Tr. at 64. Second, the vehicle was parked on a public street and was positioned approximately four feet from the curb. Tr. at 41, 84.

Chief Asselin remained with Defendant's vehicle while Deputy Chief Bonneau proceeded to the nearby District Attorney's office and informed Assistant District Attorney Brad Grant of the situation. Tr. at 17–18. Deputy Chief Bonneau asked Grant if it was permissible to perform an inventory search prior to having the truck towed. Tr. at 18. Grant told Deputy Chief Bonneau that he saw no problem with the inventory search as long as there was a policy in place and advised them to proceed. Tr. at 19. Deputy Chief Bonneau informed Chief Asselin via radio of the assistant district attorney's position, and Chief Asselin then requested the assistance of a patrol unit and opened the vehicle. Tr. at 65. He first checked a fishing bag located under the front seat of the truck and opened it to view its contents. *Id.* The bag contained a handgun. *Id.* At this point, Chief Asselin put the gun back in the bag, placed it back in the truck, and locked the truck again. *Id.* He then notified Deputy Chief Bonneau by radio of his discovery. Tr. at 19. Deputy Chief Bonneau then informed Grant of this development, and they proceeded to obtain a warrant to search the vehicle. Tr. at 20. The truck was then towed to the police station and impounded. Tr. at 21. A search of the vehicle was completed pursuant to a warrant. Tr. at 21. The search revealed documentation resulting in investigation into Defendant's alleged possession of a second firearm. *See* Defendant's Pre-hearing Memorandum in Support of Motion to Suppress Evidence (Docket No. 12) at 6.

## II. DISCUSSION

### A. Probable Cause to Arrest

Defendant first argues that he was in custody after being approached by the police at

---

4. The area of the police department in which the lavatory was located was not accessible to the public. The bathroom is generally used only by department employees. Tr. at 15. Chief Asselin testified that, to his knowledge, no one used the bathroom between the time Defendant used it and Chief Asselin found the key. Tr. at 61. At the hearing on the motion, Defendant indicated that he did not challenge how the key got into the toilet. Tr. at 16.

5. Chief Asselin testified that they did so because he did not find Defendant's assertion that he was traveling on foot to be credible. Tr. at 63. After the discovery of the key, Chief Asselin decided that it was likely that the vehicle was somewhere in the area of the town hall. *Id.*

the Skowhegan welfare office and that the Skowhegan police had insufficient evidence to support a finding of probable cause at that time. The Government responds that the Skowhegan police did have sufficient evidence to establish probable cause to arrest Defendant at the time he was approached at the welfare office or, shortly thereafter, at the Skowhegan police station. The Court concludes that Defendant was in custody and not free to leave from the time he was approached by the Skowhegan police at the welfare office. The Court must now determine if the arrest was lawful.

 Probable cause to arrest exists if the facts and circumstances within a police officer's knowledge, and of which they had reasonably trustworthy information, would warrant a prudent person to believe that the defendant had committed a crime. *Alexis v. McDonald's Restaurants Of Massachusetts*, 67 F.3d 341, 349 (1st Cir.1995). Police officers cooperating with others on an investigation are entitled to rely upon each other's knowledge of facts when forming the conclusion that probable cause exists. *United States v. Meade*, 110 F.3d 190, 193 (1st Cir. 1997). When an officer with information amounting to probable cause directs another officer without such knowledge to make an arrest, the directing officer's knowledge is imputed to the arresting officer. *Id.*

 At the time Defendant was taken into custody at the Skowhegan town offices the police had probable cause to arrest him. The Fairfield police relayed the information they had gained during their investigation of the break-ins to Skowhegan police in an effort to enlist their assistance. That information included two eyewitness descriptions matching Defendant's general age and detailed descriptions of the two vehicles registered in his name, including, on one occasion, the license plate number of his truck. This information, together with Defendant's lengthy history for burglary, theft, robbery, and breaking and entering is sufficient to support the existence of probable cause to arrest Defendant. Fairfield police informed Skowhegan police not only of the facts themselves, but also of their conclusion that probable cause existed. The Skowhegan police were entitled to rely on the Fairfield police's information establishing probable cause to arrest when confronting Defendant at the welfare office.

## B. Lawfulness of the Search

 Defendant next contends that the decision to impound his vehicle and to perform the inventory search was unconstitutional, requiring the Court to suppress the evidence discovered during the vehicle search. The Government responds that the vehicle's removal and search were lawfully based on the public safety concerns. The inventory search exception to the search warrant requirement applies only to vehicles lawfully in police custody. Therefore, in determining the validity of an inventory search, a court must first ascertain whether the decision to impound the vehicle was proper. Both the impoundment and the inventory search must meet the strictures of the Fourth Amendment. The Court finds that the police officers' decision to impound the vehicle was appropriate given the fact that Defendant's truck was parked approximately four feet from the curb and, that the resultant inventory search was conducted in accordance with police procedure was lawful.

 Chief Asselin and Deputy Chief Bonneau testified that they impounded Defendant's vehicle because the vehicle's position on the street—parked approximately four feet from the curb—presented an issue of public safety. Tr. 18, 41, 84, 90. Skowhegan's policy instructs police officers to remove a vehicle that "unreasonably obstruct[ ], interfere[ ] with, or impede[ ] the free flow of traffic . . . or when it constitutes a danger to public safety." Gov. Ex. 1 at § III(C)(1). Defendant suggests that the town's written guidelines and procedures regarding vehicle towing do not satisfy the requirements of the Fourth Amendment. Specifically, he complains that the procedures are defective because they allow for an excess of discretion on the part of the officer regarding the decision to tow the vehicle.

On the contrary, the town's procedures did not, in this instance, leave the decision whether to tow the vehicle to the discretion of the officer. Rather, the guidelines clearly state that "[w]hen a vehicle is . . . in a loca-

tion where it unreasonably obstructs, interferes with, or impedes the free flow of traffic ... such a vehicle shall be removed." Govt. Ex. 1 § III(C). Under certain circumstances, the policy does permit the owner to move the obstructing vehicle without further police involvement. That option, however, assumes that the owner is willing and able to move the obstructing vehicle. Here, as a result of his arrest, Defendant was unavailable. Therefore, the officers reasonably employed Skowhegan's towing policy. There is nothing unconstitutional about a police department policy which provides an officer with the discretion to determine whether the vehicle owner is both willing and able to move the obstructing motor vehicle.[6] *Colorado v. Bertine*, 479 U.S. 367, 375–76, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987).

Once the officers had decided to tow Defendant's truck, the decision to perform an inventory search was reached in accordance with the Skowhegan Police Department's policy on vehicle inventory searches. *See generally* Gov. Ex. 1. The policy provides for the performance of inventory searches on vehicles which are towed by a police department-dispatched towing service, whether the vehicle is towed to a police facility or to a storage facility.[7] *Id.* at § III. The search is to be conducted by the officer requesting the tow truck and may be performed either before or after the vehicle is towed. *Id.* The stated purpose of the inventory search "is not to locate evidence of criminal activity, but to protect the owners['] property, protect the department from subsequent claims of loss or stolen property, and to protect officers from dangerous instrumentalities." *Id.* at § II. The applicable inventory procedures require the police department to "inventory all

personal property contained" in the vehicle. *Id.* at § III(A).

Defendant argues that the inventory search was a subterfuge for the investigation of the truck. He has offered no evidence to support this theory. Simply because the vehicle impoundment "stemmed in part from an investigatory motive does not change either the analysis or the result. As long as impoundment pursuant to the community caretaking function is not a mere subterfuge for investigation, the coexistence of investigatory and caretaking motives will not invalidate the seizure." *See Rodriguez–Morales*, 929 F.2d at 787; *see also United States v. Frank*, 864 F.2d 992, 1001 (3d Cir.1988) (that inventory search serves investigatory as well as administrative purpose does not invalidate the search); *United States v. Orozco*, 715 F.2d 158, 161 (5th Cir.1983) (per curiam).

Here, the inventory search was conducted on a lawfully impounded vehicle, pursuant to standard police procedure. *See South Dakota v. Opperman*, 428 U.S. 364, 372, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). The Skowhegan Police Department policy on vehicle inventory searches requires that "inventory procedures apply whenever a vehicle is towed by a department-dispatched towing service or taken into custody by police." Gov. Ex. 1 at § III(A). The Court concludes, therefore, that Defendant's rights were not violated by the inventory search in this case.

Accordingly, it is **ORDERED** that Defendant's Motion to Suppress be, and it is hereby, **DENIED**.

---

6. The Court notes that the existence of alternative means of dealing with the vehicle, even less intrusive means, does not invalidate the decision to impound. *United States v. Rodriguez–Morales*, 929 F.2d 780, 786 (1st Cir.1991). "The critical question ... is not whether the police needed to impound the vehicle in some absolute sense, or could have effected an impoundment more solicitously, but whether the decision to impound and the method chosen for implementing that decision were, under all the circumstances, within the realm of reason." *Id.* at 786 (quoting *United States v. Brown*, 787 F.2d 929, 932 (4th Cir. 1986)).

7. The policy sets forth the procedure for inventory searches of vehicles towed by a department-dispatched towing service. *Id.* § III(A)(4). The policy directs, in part, that:

the officer shall examine the vehicle ... and inventory all personal property contained therein. Suitcases, pocketbooks, paper bags and all other unlocked containers, whether open or closed, shall be examined, and the contents shall be inventoried in writing. If the container cannot be opened without damaging it, then the inventory shall include simply a description of the unopened container .... *Id.*