# United States Court of Appeals
## For the First Circuit

No. 05-1163

UNITED STATES,

Appellee,

v.

HANSANA VONGKAYSONE,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Torruella, Circuit Judge,

Campbell, Senior Circuit Judge,

and Howard, Circuit Judge.

Henry W. Griffin for appellant.
F. Mark Terison, Senior Litigation Counsel, with whom Paul
D. Silsby, United States Attorney, was on brief for appellee.

January 12, 2006

**CAMPBELL**, <u>**Senior Circuit Judge**</u>.  Defendant-appellant Hansana Vongkaysone appeals from his conviction in the United States District Court for the District of Maine.  Vongkaysone entered a conditional guilty plea to one count of conspiracy to distribute and to possess with intent to distribute cocaine and fifty grams or more of cocaine base in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A).  On appeal, Vongakaysone argues that the district court erred in denying his motion to suppress evidence seized in a search of his person and automobile.  We affirm his conviction.

## I.  Background

The facts of the case, set out in the recommended decision by the magistrate judge in <u>United States</u> v. <u>Vongkaysone</u>, 2004 WL 2011447 (D. Me. 2004), are summarized below.  On January 11, 2004, a confidential informant told United States Drug Enforcement Agency ("DEA") special agent Paul Buchanan that a person named "Jimmy" was going to travel from Portland, Maine to Massachusetts and return with crack cocaine.  Buchanan already knew, based on past investigation, that Jimmy's true name was Huang Nguyen.  DEA agents had bought crack from him on several prior occasions.

Buchanan called the Maine State Police ("MSP") and put them on the lookout for a white car Nguyen had driven during prior drug purchases.  The MSP found the vehicle, stopped it and searched

-2-

it, finding two ounces of what was later confirmed to be cocaine base. The MSP arrested Nguyen and an Asian female, Dong Lee. Nguyen agreed to cooperate and told Buchanan that he was a runner for Lee and, for the past three or four months, had been making three or four trips a week to Lowell, Massachusetts to buy two ounces of crack from a person he knew as "Boy" or "Little Boy."

The next day, Nguyen placed a recorded call to Little Boy in Lowell to set up a buy of two ounces of cocaine base at a certain parking lot in Lowell. Buchanan went with Nguyen to the location. Shortly after their arrival, a silver Honda Prelude, just as Nguyen had described, arrived and pulled up next to Nguyen's car. Agents seized and searched the car's occupant, whom Nguyen identified as Little Boy. The agents seized two ounces of what seemed to be crack cocaine from Little Boy's pocket. Little Boy was identified as Eddy Phanthai, and he agreed to cooperate. Buchanan had never heard of nor dealt with Phanthai before his arrest.

On January 16, 2004, several DEA agents, including Buchanan, Steven Thibodeau, and Sheila Wetherbee, interviewed Phanthai pursuant to a proffer agreement. Phanthai told them that his source of crack was someone he knew as "Na" and that he would meet Na once a week to buy 10-15 ounces and sometimes as much as half a kilo of cocaine powder. He said that he would pay about $800 an ounce for the powder, which he then cooked into crack

-3-

cocaine for resale in Maine. Buchanan believed that Phanthai's account of his activity matched what Nguyen had told Buchanan.

Phanthai described Na as a light-skinned Asian man about thirty years of age, clean-cut, decently dressed, with short hair, about five feet seven inches and approximately 160 pounds. Phanthai said that Na usually wore a collared shirt, slacks, and nice shoes and that he often wore a nice jacket. Phanthai said he knew that Na was from Rhode Island and usually drove a tan-colored Nissan with Rhode Island plates. Phanthai said that he would usually call Na on a Sunday and meet him the next day in Lowell, either inside or in the parking lot of a Cambodian or Vietnamese restaurant. Na picked the meeting place and usually did not tell Phanthai where it was until a few minutes before the exchange. Phanthai said that Na was always on time and sometimes a few minutes early, and that Na usually arrived before he did.

Phanthai further described that Na would usually be inside the restaurant, so Phanthai would go to Na's car, put the money in the glove compartment and remove the drugs. Sometimes, however, Na would be in his car in the parking lot, and Phanthai would get into the car with Na and exchange the money and drugs in person. Phanthai told the agents that Na usually came alone but sometimes arrived with his cousin, an Asian male who was five feet seven inches tall, with short hair and dress similar to Na's.

-4-

Phanthai said that he usually spoke English to Na and his cousin but sometimes spoke Laotian.

After his interview with the agents, Phanthai made a recorded phone call to someone he said was Na to order cocaine. The agents attempted to trace the phone number but up to the time of defendant's arrest they had yet to confirm independently the identity of the recipient of the call. From January 18 through January 23, 2004, Phanthai made a series of recorded calls to the person he said was Na. The calls were made from the Old Colony Correctional Center in Bridgewater, Massachusetts. Buchanan noted that the person Phanthai was calling seemed to know Phanthai and to have spoken to him before. An arranged meeting fell through twice.

On January 23, 2004, at about 4:40 p.m., Buchanan recorded a final call between Phanthai and the man Phanthai identified as Na. During the call, Phanthai and Na arranged a meeting for 6:45 that evening at the Thanh Thanh Restaurant on Chelmsford Street in Lowell. Phanthai ordered half a kilo of cocaine. There was no further contact between Phanthai and Na. Phanthai did not ask whether Na would be traveling alone. Buchanan testified that in making arrangements for drug deals, such a question would not be asked and that asking too many questions might scare off the dealer.

Buchanan told the other agents about the arranged drug deal and left the jail at about 6:15 to drive from Bridgewater to

the Thanh Thanh Restaurant in Lowell. He was in contact with the agents as he drove. Between 5 and 5:30 p.m., the agents involved in the upcoming operation gathered at the Lowell office of the Cross-Border Initiative ("CBI"), a DEA task force made up of local, state and federal officers. Agents were given copies of a written operational plan, and Wetherbee briefed them about the operation, including what Phanthai had said about the suspects' physical appearances.

Thibodeau was present at the briefing, which he recalled took about 15 minutes, and he remembered the agents were told that at least one Asian male and perhaps two were expected to arrive at the restaurant in a car with Rhode Island plates. The car was likely to be a tannish-colored car similar to a Nissan and was expected to arrive on time at about 6:45 p.m. The agents were told that the suspect was prepared to sell cocaine to Phanthai. The operational plan was to conduct surveillance at the scene, look for suspicious activity and arrest as appropriate the people matching the descriptions they had received.

At about 6:20 p.m., the agents left the CBI office in at least three cars and drove to the restaurant in order to conduct surveillance. Chelmsford Street is a busy area with a great deal of traffic. The restaurant has two entrances to its parking lot, one at the rear from Powell Street and one at the front off of Chelmsford Street. Agents Wetherbee and John Bosse parked on

-6-

Powell Street where they could see the rear entrance to the restaurant and had an obscured view of the parking lot. Agents Gregory Boucher, Barry Kelly and two others parked in the lot of a business across Chelmsford Street with a clear view of the front entrance to the restaurant and its parking lot. Agents Thibodeau, Greg Colletti and Bill Hanlin parked in the parking lot of a Store 24 next to the restaurant with a clear view of its parking lot. The agents were in radio contact with one another during the operation in order to compile their observations from different angles. It was January and dark outside, but the parking lot of the restaurant was lit. Phanthai was not at the scene.

At 6:44 p.m., Thibodeau saw a dark Acura with Rhode Island plates pull into the front entrance to the restaurant. Two Asian males were inside it. The car parked in the left rear part of the parking lot, with the driver's side facing Thibodeau. Shortly thereafter, at about 6:55 p.m., a red Honda pulled into the Powell Street entrance and backed into a space near the Acura. Thibodeau saw a man get out of the passenger seat of the Honda and walk over to the passenger seat of the Acura. The Honda passenger leaned into the rolled-down window of the Acura and appeared to engage in conversation with the Acura passenger. Thibodeau did not observe anything being exchanged and could not overhear the conversation. Boucher also observed this interaction and thought that it lasted between thirty seconds and a minute. The Honda

passenger went back to the Honda, which then drove away through the Powell Street exit.

The agents discussed over their radios whether a drug transaction had occurred. Wetherbee and Bosse watched the Honda leave the parking lot, tried to read the plate number and called it out to one another. No one wrote down the number or suggested that the Honda be followed or stopped. Wetherbee later testified that though she did not remember the license number of the car, she was certain that it had Massachusetts plates.

After the Honda left, Thibodeau saw the Acura with Rhode Island plates back into the space that the Honda had been in, facing the restaurant. The Acura was about ten feet away from where Thibodeau was parked. At this time, the parking lot held no other cars in which people were sitting and waiting. During the surveillance, no other cars with Rhode Island license plates were seen in the parking lot. After a minute or so, the Acura moved across the parking lot and stopped facing the restaurant. The driver got out, went to the window of the restaurant, looked in, then looked around the parking lot and returned to the car. The agents conferred via radio abut the significance of what they had seen and their belief they had the right people. Hanlin and Colletti gave the command to move in. The agents drove their vehicles toward the Acura and boxed it in, with Thibodeau's vehicle behind it, Boucher's vehicle next to the driver's side, and

Wetherbee's vehicle next to the passenger's side. An agent ordered the occupants out of the vehicle, and they complied.

Wetherbee placed her hands on the passenger as he exited the Acura and led him to the hood of her own car. He had short hair, was about five feet seven inches tall, wearing a nice jacket, a button-up dress shirt and jeans. Despite the fact he was wearing jeans and not dress pants, Wetherbee thought he fit the description that Phanthai had given. She asked him his name, which he gave as Hansana. She thought that "Na," the last two letters of his name, could be his nickname and asked him if he went by "Na." He did not answer and said he did not know when she asked whether he had any nicknames. She retrieved his wallet from his back pocket, in which there was identification listing him as Hansana Vonkaysone. Bosse reached into Hansana's pocket and pulled out what looked like a great deal of money, but because Hansana complained he was cold, the agents did not immediately count the money. Hansana was handcuffed a few minutes later.

As Wetherbee approached the passenger side of the Acura, Boucher, with his gun drawn but pointed downwards, and Colletti approached the driver's side and ordered the driver to put his hands up. He immediately complied, and Boucher holstered his gun. The driver left the car, and Boucher and Colletti handcuffed him. Boucher performed a "visual sweep" of the car and saw no other occupants. He did not actually search the vehicle. Once the

driver was handcuffed, Boucher left him with Colletti and returned to the CBI office. After Hansana was secured, Wetherbee asked that the driver face her so that she could see him. She observed another Asian male, thinner than Hansana but with a dress and hairstyle similar to Hansana, in keeping with Phanthai's description. His name was later established to be Phonthep Vongkaysone. He is not involved in this appeal.

Thibodeau cleared the vehicle by looking through the rear window and passenger side door to check for other passengers. There were no other occupants, but he saw a brown plastic shopping bag on the floor of the front passenger seat. He looked at it and noticed that it held a white powdery substance that looked like cocaine. He told the other agents of the discovery and gave the bag to Hanlin. No one told Thibodeau that the suspects were under arrest before he looked inside the bag, nor had the suspects consented to a search.

Buchanan arrived at about 7 p.m., which he estimated was within five minutes of the detention of the suspects. Lowell police officers transported the defendants to the Lowell Police Department. The two men were indicted on July 28, 2004 on one count of conspiracy to distribute and to possess with intent to distribute cocaine and fifty grams or more of cocaine base in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A). The co-

defendants filed motions to suppress the evidence seized during the arrest and search of their persons and the car.

A magistrate judge held a joint hearing on the motions on September 2, 2004. On September 9, 2004, the magistrate judge recommended that the motions be denied, and the district court adopted that recommendation on October 13, 2004. On October 25, 2004, Hansana Vongkaysone entered a conditional guilty plea under Fed R. Crim. P. 11(a)(2). The district court sentenced him to a term of 240 months and ten years of supervised release. This appeal followed.

## II. Discussion

In reviewing a denial of a motion to suppress, we review questions of law de novo and factual findings for clear error. United States v. Khounsavanh, 113 F.3d 279, 282 (1st Cir. 1997). Vongkaysone argues that the district court erred in denying his motion to suppress because his removal from the Acura by Wetherbee was, at the time, an arrest, and one without probable cause, as the officers were relying exclusively on the information given them by Phanthai, whose reliability was unknown, and they could not easily corroborate that information in the dark parking lot of the restaurant. Vongkaysone points out that the police officers were not able to confirm that he was Na until after the initial arrest. We find, however, that the police officers had probable cause to

arrest Vongkaysone at the time they moved in and ordered the occupants to exit the Acura. We therefore affirm his conviction.

"Probable cause exists when police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person would believe the suspect had committed or was committing a crime." United States v. Young, 105 F.3d 1, 6 (1st Cir. 1997) (citation omitted). The inquiry into probable cause focuses on what the officer knew at the time of the arrest, United States v. Brown, 169 F.3d 89, 91 (1st Cir. 1999), and should evaluate the totality of the circumstances. United States v. Reyes, 225 F.3d 71, 75 (1st Cir. 2000). "[P]robable cause is a common sense, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." United States v. Meade, 110 F.3d 190, 198 n.11 (1st Cir. 1997) (citation and internal punctuation omitted).

In this case, although Phanthai was not a familiar informant for the police when he told them about Vongkaysone, various factors bolstered his credibility from the outset. First, since he had been caught dealing in drugs, it was to his advantage to produce accurate information to the police so as to qualify for the leniency he sought. If the January 23 drug deal he later set up were a mere fiction, this soon would have been apparent to the police, and Phanthai would have been the loser. Moreover, he

admitted to his own role in the drug dealing with Vongkaysone, thus incriminating himself, not just Vongkaysone, in that additional criminal conduct. A statement against interest of this type bolsters an informant's credibility. See United States v. Principe, 499 F.2d 1135, 1137 (1st Cir. 1974) ("The informant was both named and was revealed as a participant in the crime. The informant's knowledge was obtained from recent personal observation. That [the informant] was making a declaration against interest lends it further credence.").

Additionally, Phanthai's credibility was bolstered by various events preceding the arrest. Not everything he said proved accurate, but most of it did. As the district court noted, an informant's statements need not be fully corroborated for an officer to conclude that they are generally reliable. "[T]he risk that [an] informant is lying or in error need not be wholly eliminated. Rather what is needed is that the probability of a lying or inaccurate informer has been sufficiently reduced by corroborative facts and observations." United States v. Winchenbach, 197 F.3d 548, 556 (1st Cir. 1999) (citation omitted).[1]

---

[1]In United States v. Diallo, we said,

> According to defendants, the information [provided by an informant] was unreliable because the informant stated that there would be three men in a red Toyota when in actuality there were four men in two cars. The inconsistencies between the informant's information and the reality of the situation were not of such importance that the information could be concluded to be incorrect.

Here, although the police did not trace the phone number Phanthai dialed to arrange the meeting with Vongkaysone, they recorded a number of phone calls between Phanthai and an individual who appeared to recognize him and eventually agreed to sell him drugs at 6:45 on the night of January 23, 2004. These recordings, plus other factors already mentioned, strongly supported the belief that Phanthai was indeed in touch with the source he called "Na" and that the arranged drug deal was as represented.

Phanthai told the officers that Na, an Asian male, usually drove a tan Nissan with Rhode Island plates, was always punctual or early, and sometimes had his cousin, also an Asian male, in tow. A gray Acura with Rhode Island plates pulled into the parking lot designated by Na in his phone conversation with Phanthai precisely at 6:44 p.m., a minute before the scheduled rendezvous. Two Asian males could be seen inside. No other Rhode Island plated cars were observed in the parking lot prior to the arrest. Thus, except for the fact the car was a gray Acura, not a tan Nissan, what happened fitted exactly Phanthai's description of the anticipated arrival of the drug dealer, Na, and his cousin.

The informant was correct as to the identities of three of the four men along with the night the activity would take place and one of the vehicles used. A tipster need not deliver an ironclad case to the authorities on the proverbial silver platter. It suffices if a prudent law enforcement officer would reasonably conclude that the likelihood existed that criminal activities were afoot, and that a particular suspect was probably engaged in them. 29 F.3d 23, 26 (1st Cir. 1994) (citation omitted).

The conduct of the Acura's occupants, moreover, was not otherwise inconsistent with Phanthai's statements about what transpired at the past drug deals with Na. The encounter with the passenger from the red Honda was, to be sure, an added feature, but while no drugs were seen to change hands, the apparently purposeful arrival and, after the brief conversation, quick exit of the Honda, was at least consistent with what could have been another drug-related activity. It was, therefore, reasonable for the police officers to believe that Phanthai's information was further corroborated by the events they witnessed in the parking lot immediately prior to their arresting defendant.

Given the above events, witnessed by the officers, tending to corroborate the officers' prior information that a drug sale to Phanthai by an Asian dealer driving a Rhode Island car, and perhaps accompanied by a cousin, was scheduled for this very time and place, we are satisfied that the officers had probable cause to arrest the occupants of the Acura after blocking the car in. The officers had good reason to believe the two Asians therein included Na, and that he had come to sell the agreed cocaine to Phanthai. Thibodeau's protective sweep of the Acura, seizure of the plastic bag and inspection of its contents constituted a valid search incident to arrest. See, e.g., United States v. Infante-Ruiz, 13

F.3d 498, 502 n.1 (1st Cir. 1994).[2]  The search of Vongkaysone which resulted in the seizure of the currency on his person was likewise valid.  <u>See</u>, <u>e.g.</u>, <u>Meade</u>, 110 F.3d at 199 ("If an arrest is lawful, the arresting officers are entitled to search the individual apprehended pursuant to that arrest.") (citation omitted).

The defendant's conviction is **<u>affirmed</u>**.

---

[2]As the magistrate pointed out, the search of the Acura itself, which led to finding the cocaine, can also be independently justified under the automobile search doctrine.  <u>United States</u> v. <u>Lopez</u>, 380 F.3d 538, 543 (1st Cir. 2004) (warrantless search of vehicle justified if officers had probable cause to believe the car held contraband).  We need not pursue this alternative analysis, however, since it seems clear the officers had probable cause to arrest the defendant when they removed him from the car.