# United States Court of Appeals
## For the First Circuit

No. 15-1349

UNITED STATES OF AMERICA,

Appellee,

v.

RANDY RAY RIVERA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Torruella, Lipez, and Thompson,
Circuit Judges.

David B. Hirsch, for appellant.
Katharine A. Wagner, Assistant United States Attorney, with whom
Carmen M. Ortiz, United States Attorney, was on brief, for
appellee.

June 9, 2016

**THOMPSON**, <u>Circuit Judge</u>.

**Setting the Stage**

Randy Ray Rivera pled guilty to being a felon in possession of a firearm. <u>See</u> 18 U.S.C. § 922(g)(1). His conditional plea reserved the right to appeal from the district judge's order denying his motion to suppress evidence seized from his home — a seizure authorized by a warrant issued by the same judge. Rivera had argued below that the affidavit DEA special agent John Barron submitted in support of the application failed to establish probable cause because it did not provide an adequate nexus between his drug dealing and his house.[1] Rivera had also asked the judge for an evidentiary hearing — dubbed a "<u>Franks</u> hearing," after <u>Franks</u> v. <u>Delaware</u>, 438 U.S. 154 (1978) — so that he could challenge the truthfulness of Barron's affidavit statements. But the judge concluded that even if the affidavit failed to supply probable cause (a question the judge saw no need to decide), Rivera's suppression bid failed because Barron had obtained the warrant in good faith. <u>See</u> <u>United States</u> v. <u>Leon</u>, 468 U.S. 897, 922 (1984) (discussing how evidence seized in good faith, in reliance on a warrant later invalidated, may still be admissible). And the judge also concluded that Rivera had failed

---

[1] "DEA" is short for "Drug Enforcement Administration."

- 2 -

to make the substantial showing of probable falsity on Barron's part, thus making a Franks hearing unnecessary.

An unhappy Rivera appeals both aspects of the judge's ruling. We affirm, though on the first issue we think law enforcement actually had probable cause for the search — which removes any need to invoke the good-faith exception.

**Probable-Cause Issue**

Background

We cite only those facts necessary to put the probable-cause issue into workable perspective — presenting them, of course, in the light most favorable to the suppression ruling. See, e.g., United States v. McGregor, 650 F.3d 813, 823–24 (1st Cir. 2011); United States v. Owens, 167 F.3d 739, 743 (1st Cir. 1999).

Back in 2012, a Vermont state trooper stopped an SUV for a traffic infraction. The driver, Shawn Kivela, consented to a vehicle search. And that search turned up about 5 ounces of what turned out to be crack cocaine.

The trooper arrested and Mirandized Kivela and his passengers, Randy and Star Gaboriault. After the trio waived their Miranda rights, a series of police interviews ensued. Among other juicy tidbits, law enforcement learned from Kivela that he and the Gaboriaults had driven to Springfield, Massachusetts to meet with a "Puerto Rican male" known as "Melvin" or "Randy" (we'll use

"Randy" for simplicity) at a third-floor apartment at 6 Beaumont Street — a very sparsely furnished apartment that "Randy" used as a drug-stash house, not (apparently) as a home. Kivela said that the Gaboriaults had bought about 5 ounces of crack from "Randy" too — paying him $7,000, according to Star Gaboriault — and body-cavity searches of the Gaboriaults uncovered that crack amount. Kivela added that he had been buying crack from "Randy" on a weekly basis since 2009. The Gaboriaults routinely accompanied him on these drug-buying sprees — Kivela would score about 3 or 4 ounces of crack per visit, while the Gaboriaults would score between 6 and 9 ounces. Kivela and "Randy" would communicate by text, Kivela said. And he identified a photo of Rivera as "Randy."

Rivera, it turns out, was no stranger to the Springfield police — a criminal-record check disclosed 13 prior narcotics convictions plus a prior ammunition-possession conviction. He lived at 56 Merwin Street (a street in Springfield) with his girlfriend Yayaira Guzman, a confidential source ("CS") told the police.[2] Registry-of-deeds records showed that Guzman solely owned the Merwin-Street property. The CS also identified some cars (registered to Guzman at the Merwin-Street address) — including a white Infiniti FX-35 — that Rivera used. A police-surveillance

---

[2] According to the record in this case, Rivera's "residence is part of a two-story, two-family duplex."

team regularly saw Rivera and Guzman entering and leaving the Merwin-Street property, and routinely saw the cars described by the CS at that address as well.

Most helpfully for the police, the CS eventually agreed to participate in a controlled buy of crack from Rivera. On the day of the buy, but before the buy went down, a DEA agent spotted the Infiniti FX-35 at 56 Merwin Street — Rivera's home — at 9 a.m. and again at 1:45 p.m. Around 2:47 p.m., the CS phoned Rivera to say that he would be at 6 Beaumont Street — Rivera's stash house — shortly. The DEA saw the Infiniti drive away from Rivera's home around 2:50 p.m., roughly 3 minutes after the CS's call. At about 2:56 p.m., Rivera texted the CS to stay away from 6 Beaumont Street because a police officer was parked outside. Agents spotted the Infiniti parked at 6 Beaumont Street a minute later.

Following Rivera's instructions, the CS drove to a Walgreens parking lot. Rivera said he would package up the crack and meet the CS there. The surveillance team saw the Infiniti drive away from 6 Beaumont Street at 3:27 p.m. An officer later identified the driver as Rivera. Investigators watched as the Infiniti pulled up behind the CS's vehicle. Rivera honked the Infiniti's horn and motioned to the CS to follow him to the back of the parking lot. The CS did as asked. Then the CS got into the Infiniti around 3:30 p.m., and after a short time, returned to

his car with a package of what proved to be crack.  Investigators followed Rivera to a body shop, saw him get out and walk around a bit, and then tailed him back to 6 Beaumont.

Armed with this information, the DEA's Barron applied for federal warrants to search Rivera's residence at 56 Merwin Street and his stash house at 6 Beaumont Street.  In addition to recounting the events just described, Barron's accompanying affidavit stated that — based on his 13 years of training and experience, including his participation in over "500 narcotics investigations" — dealers often sell drugs at places other than where they live, though they frequently hide evidence of their illicit trade in their homes:  weapons; cash; expensive items, like furniture, artwork, and jewelry; records showing things like addresses, phone numbers, drug buys, and steps taken to launder drug money; photos of themselves and their accomplices, etc.  The judge signed the warrants.  And the search of Rivera's residence revealed $132,571 in cash, money-order receipts, and a loaded 9mm handgun, while the search of his stash house disclosed (among other things) sizeable amounts of crack and cocaine.

Rivera's indictment (on a felon-in-possession-of-a-firearm charge), rejected suppression motion (a motion that only targeted items taken from his home), conditional guilty plea (reserving the right to contest the judge's suppression ruling),

and appeal to us followed apace.  Now we must decide whether Rivera is right that the judge's suppression order amounts to reversible error — an argument premised on the theory that the affidavit did not establish probable cause because it did not show a nexus between drug trafficking and his house.  Rivera is wrong, however, for reasons we will come to — right after we highlight the legal principles that govern our analysis.

## Legal Primer

The Fourth Amendment requires that search warrants issue only on a showing of probable cause, see U.S. Const. amend. IV — "a common sense, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act," see United States v. Vongkaysone, 434 F.3d 68, 73-74 (1st Cir. 2006) (quoting United States v. Meade, 110 F.3d 190, 198 n.11 (1st Cir. 1997)). To satisfy this standard, a search-warrant application must reveal probable cause to believe two things:  one, that a crime has occurred — a.k.a., the "commission" element; and two, that specified evidence of the crime will be at the search location — a.k.a., the "nexus" element.  See, e.g., United States v. Joubert,

778 F.3d 247, 251 (1st Cir. 2015).  Rivera focuses only on the nexus element.  So we will too.

When it comes to nexus, common sense says that a connection with the search site can be deduced "from the type of crime, the nature of the items sought," plus "normal inferences as to where a criminal would hide" evidence of his crime.  See United States v. Feliz, 182 F.3d 82, 88 (1st Cir. 1999) (quoting United States v. Charest, 602 F.2d 1015, 1017 (1st Cir. 1979)).  Common sense also says that when a criminal peddles narcotics "outside his home," one can infer that "evidence of his drug dealing activity" will be found "in the home," at least when he is spotted "leaving the home immediately prior to selling drugs."  See United States v. Barnes, 492 F.3d 33, 37 (1st Cir. 2007).

Keep in mind too that probable cause does not demand certainty, or proof beyond a reasonable doubt, or even proof by a preponderance of the evidence — it demands only "a fair probability that contraband or evidence of a crime will be found in a particular place."  Illinois v. Gates, 462 U.S. 213, 235, 238 (1983); accord Feliz, 182 F.3d at 87 (explaining that the government need not show that the agent's belief "that evidence of a crime will be found" is "necessarily correct or more likely true than false").  "Fair probability" is another way of saying "reasonable likelihood," by the way.  See United States v. Clark,

- 8 -

685 F.3d 72, 76 (1st Cir. 2012). And in asking whether probable cause existed, courts look to the "totality of the circumstances," see Gates, 462 U.S. at 238 — a phrase that means that all material "circumstances should be considered," see United States v. Correa-Torres, 326 F.3d 18, 23 (1st Cir. 2003).

Last but not least, we stress that when evaluating a judge's suppression ruling, we review legal conclusions de novo and factual findings for clear error. See, e.g., McGregor, 650 F.3d at 819-20. And because of the de novo component to our review, we can affirm on any ground appearing in the record — including one that the judge did not rely on. See United States v. Arnott, 758 F.3d 40, 43 (1st Cir. 2014); see also United States v. García-Álvarez, 541 F.3d 8, 12 (1st Cir. 2008) (noting that we review a suppression-motion denial "with deference," upholding the denial "if any reasonable view of the evidence supports it"); Feliz, 182 F.3d at 86 (similar).

## Analysis

Rivera does not dispute that agents had probable cause to believe that he was a long-time drug pusher. And he does not dispute that agents had probable cause to believe that he lived at 56 Merwin Street. Instead he principally argues that the search-warrant affidavit established only that he "confine[d]" his drug "business" to his stash house — running his drug operation "from

there as opposed to his home." And this means that the affidavit provided no nexus between his home and his alleged drug peddling and thus supplied no probable cause for the house search — or so he says. Though ably presented, his argument ultimately fails to persuade.

Taking the facts in the light most agreeable to the suppression order, as we must, see McGregor, 650 F.3d at 823-24, we can infer that Rivera used a phone at his house (either a landline or a cell phone — the record doesn't say which it was) to conduct his drug business, i.e., talking with the CS to help push the crack deal along. That is a commonsense insight, given the timeline of events:

- Agents saw the Infiniti parked outside Rivera's home at 1:45 p.m.

- The CS called Rivera at 2:47 p.m. to tell him he was minutes away from the stash house — the agreed-to rendezvous point.

- After finishing his drug-related call, Rivera drove off in the Infiniti at 2:50 p.m., stopped at the stash house at 2:57 p.m., and gave the CS the crack in the Walgreens parking lot at 3:31 p.m.

So while the search-warrant affidavit does not explicitly say Rivera was at home when he had a drug-related phone confab with the CS, we can — consistent with common sense — infer as much given

- 10 -

the concatenation of circumstances. And that means that the affidavit contains evidence showing that Rivera used his home as a communications point to further his drug crimes — making it reasonably likely that a search there would reveal incriminating evidence, such as his drug contacts' names and phone numbers. And remember, the affidavit noted that dealers often keep info of that sort in their homes — "a factor" that a judge can "weigh in the balance." United States v. Hoffman, 832 F.2d 1299, 1306 (1st Cir. 1987); accord United States v. Floyd, 740 F.3d 22, 34 (1st Cir. 2014).

But that is not all. The affidavit's info also suggests a fair probability that a search of Rivera's home would reveal other incriminating evidence. For example, given the affidavit's description of the stash house as "sparsely furnished" and not lived in (that's the account Kivela gave agents), one can infer that Rivera — a long-time, high-volume drug dealer — would opt to keep cash from his sales and stuff he bought with his profits (e.g., furniture, artwork, jewelry) at his home. After all, common sense indicates that a drug pusher would want to hide these drug-connected things in a "safe yet accessible place," like a house, see Feliz, 182 F.3d at 87-88 — a stash house would not cut it, experience tells us, because it is a dangerous venue, often filled with criminals looking to steal whatever they can from there. See

- 11 -

generally United States v. Kenney, 756 F.3d 36, 40 (1st Cir. 2014) (discussing a planned stash-house robbery). On top of all this, the affidavit also permits an inference that Rivera would have a firearm at his home to protect his drug cash and spoils from any would-be robbers — a commonsense inference to be sure, deriving (as it does) from the everyday understanding of the drug trade's violent nature. See generally United States v. Rivera–González, 776 F.3d 45, 51 (1st Cir. 2015) (emphasizing that guns are common in the drug trade).

So looking at everything — i.e., taking in the totality of the circumstances — we think the affidavit established a fair probability of finding incriminating items in Rivera's residence. And Rivera gives us no convincing reason to hold otherwise.

Take first Rivera's argument about "the evidence show[ing] that [he] took pains to confine his business" to the stash house. Yes, the search-warrant affidavit provides no specific info showing that Rivera actually doled out drugs from his home. But again, a commonsense reading of that document shows that he participated in a drug-related call with the CS from his house. And that commonsense insight sinks his line of argument about only doing "business" from the stash house.[3]

---

[3] Although the judge bypassed the probable-cause issue, he did think that "[t]he evidence in the affidavit was extremely thin . . . in showing the connection between [Rivera's] drug trafficking

- 12 -

Unwilling to give up so easily, Rivera spends a lot of time trying to convince us not to follow Barnes. There, we held that even though agents only saw the defendant sell drugs from his SUV, the search-warrant affidavit showed there was a fair probability that they would find "evidence of drug dealing" at his house — and as support we noted (in a passage we quoted earlier) that "it is reasonable to conclude that there is evidence of . . . drug dealing activity in the home . . . when the defendant is observed leaving the home immediately prior to selling drugs." 492 F.3d at 37, 38 (concluding — "given both that the [confidential informant] stated that Barnes lived at the [target] residence and that the police observed Barnes exit the [target] residence, drive away, and sell drugs on the day of his arrest and the search" — that "the totality of the circumstances strongly suggested that there was evidence of drug dealing at the [target] residence"). Hoping to avoid its reach, Rivera calls Barnes "an anomaly." But Barnes is still good law, having never been overruled or

_____

and the Merwin Street residence." "[T]he strongest inference to be drawn from the evidence," the judge added, "was that [Rivera] took pains to conduct his business, largely if not completely, from a different site on Beaumont Street." Reading the ruling as a whole and in context, we believe what the judge was saying was that the evidence was too skimpy to support the idea that Rivera actually dealt drugs from his home. And on that point, we agree. But for the reasons already given, we have no trouble concluding that Rivera took part in a drug-related call from his house, which helps establish the required nexus element.

- 13 -

discredited.  So follow it we must.  <u>See</u> <u>United States</u> v. <u>Rodríguez</u>, 527 F.3d 221, 224-25 (1st Cir. 2008) (noting the "general rule" that "newly constituted panels in a multi-panel circuit are bound by prior panel decisions closely on point").

Rivera also accuses the government of asking us to lay down a <u>per se</u> rule that agents can search a drug dealer's home whenever they spy a controlled buy.  Binding caselaw, he reminds us, rejects any rule that treats the agents' viewing of a controlled buy as "<u>per se</u> sufficient to establish probable cause to search" the dealer's residence.  <u>See</u> <u>United States</u> v. <u>Khounsavanh</u>, 113 F.3d 279, 285 (1st Cir. 1997).  But the government here asks for no such rule.  Instead, and consistent with <u>Khounsavanh</u>, the government asks us to evaluate probable cause through a totality-of-the-circumstances analysis in a commonsense manner, <u>see</u> <u>id.</u> — circumstances that include the controlled buy but also Rivera's drug-connected phone call in his house.  And staying faithful to controlling precedent, we have done just that. Consequently, Rivera's <u>Khounsavanh</u>-based argument is a nonstarter.

So too is Rivera's suggestion that a judge cannot rely on an agent's affidavit statement that drug-dealing evidence — cash, high-priced items, records, firearms, <u>etc.</u> — is often found in the dealer's home.  As Rivera sees it, such reliance is tantamount to delegating the probable-cause decision to the agent.

- 14 -

But the Federal Reporter is teeming with First-Circuit opinions (some of which we cited above) saying that "a law enforcement officer's training and experience may yield insights that support a probable cause determination." See Floyd, 740 F.3d at 34 (collecting a bunch of cases). And those cases kibosh Rivera's argument.

Let us be clear: We might very well have reached a different result had a commonsense reading of the evidence not indicated that Rivera participated in a drug-related phone call from his home. But with that inference, there is enough probable cause to believe evidence of his drug-pushing activities would be at his house. And for that reason, we need not assess the judge's good-faith-exception analysis either.

Enough said about the probable-cause issue. On to the last issue, then.

## **Franks-Hearing Issue**

Barron's search-warrant affidavit said (emphasis ours) that (a) before the controlled buy, agents "conducted database checks" that showed "Rivera <u>uses</u> a residence at 56 Merwin Street . . . in addition to the third floor apartment at 6 Beaumont Street" and that (b) "[a] confidential informant" told agents "that Rivera resides at 56 Merwin Street . . . with his girlfriend, and <u>uses</u> that residence as well as the third floor apartment at 6

- 15 -

Beaumont Street."  Claiming that the word "uses" deliberately or recklessly suggested that he had used his home to sell drugs (the affidavit, he said, "failed" to "establish" that "drugs" were there), Rivera asked the judge for a Franks hearing to test the accuracy of Barron's statement.  The judge denied the motion, finding that "uses" was not misleading because it did not suggest that Rivera "used" his home "for his drug dealing, only that he lived there."  Rivera protests that ruling.  But we notice no reversible error.

### Legal Primer

Simplifying slightly, we know that to get a Franks hearing, a defendant must "make[] a substantial preliminary showing" of intentional or reckless falsehood in the affidavit. Franks, 438 U.S. at 155-56.  "Allegations of negligence or innocent mistake" will not suffice.  Id. at 171.  Also, the contested statement must be crucial to the probable-cause calculation — no evidentiary hearing is required if after ignoring the fought-over comment, enough remains in the affidavit to show probable cause. See, e.g., id. at 171-72; United States v. Cartagena, 593 F.3d 104, 112 (1st Cir. 2010).  And we review the judge's Franks-hearing ruling for clear error, see, e.g., United States v. Moon, 802 F.3d 135, 149 (1st Cir. 2015) — meaning the ruling stands unless the judge was "wrong with the force of a 5 week old, unrefrigerated,

- 16 -

dead fish," see Toye v. O'Donnell (In re O'Donnell), 728 F.3d 41, 46 (1st Cir. 2013) (quoting S Indus., Inc. v. Centra 2000, Inc., 249 F.3d 625, 627 (7th Cir. 2001)).

## Analysis

We can make quick work of Rivera's Franks-hearing plea. Here is why. Assume — for argument's sake only — that "uses" implies that he handed out crack from his home. And assume too — again solely for argument's sake — that Barron stuck this "false" info "intentionally" or "recklessly" in his affidavit. Even with all that assumed (but not decided, we stress — lest there be any misunderstanding), Rivera's Franks-hearing quest must fail. And that is because the evidence arrayed above — including, for example, his drug-related call in his home — is sufficient to support probable cause even with the offending "uses" words out of the picture. See, e.g., Franks, 438 U.S. at 171-72; Cartagena, 593 F.3d at 112.

And that is that for the Franks-hearing issue.

## Wrapping Up

Our work over, we affirm the judge's ruling in all respects.